CARL ROWATTI AND ADRIANNE ROWATTI, PLAINTIFFS-RE-
SPONDENTS, v. JOHN GONCHAR AND NINA GONCHAR, DE-
FENDANTS-APPELLANTS, AND GARY DEL MORO, ZONING
OFFICER, MAYOR AND COUNCIL OF THE BOROUGH OF
NORTHVALE, BUILDING INSPECTOR OF THE BOROUGH OF
NORTHVALE, DEFENDANTS, AND BOARD OF ADJUSTMENT
OF THE BOROUGH OF NORTHVALE, DEFENDANT-RESPON-
DENT.

JOHN GONCHAR AND NINA GONCHAR, HIS WIFE, PLAINTIFFS-
APPELLANTS, v. THE ZONING BOARD OF ADJUSTMENT OF
THE BOROUGH OF NORTHVALE, DEFENDANT-RESPON-
DENT, AND ZONING OFFICER OF THE BOROUGH OF
NORTHVALE AND BUILDING INSPECTOR OF THE BOR-
OUGH OF NORTHVALE, DEFENDANTS.

Argued January 21, 1985—Decided November 20, 1985.

*Judith C. Reilly* argued the cause for appellants.

*Antranig Aslanian, Jr.,* argued the cause for respondents Carl Rowatti, et al. (*Aslanian & Tashjian,* attorneys).

*Timothy J. Sullivan* argued the cause for respondent Board of Adjustment of the Borough of Northvale (*Sullivan & Savetsky,* attorneys).

PER CURIAM.

Appellants own and occupy a residential dwelling in the Borough of Northvale. In 1981 they commenced construction of an addition to their home. Neighbors objected on the ground that the Borough's zoning code expressly prohibited two-family dwellings in all zones. The issue is whether the proposed structure resulted in a violation of that prohibition. The Northvale Board of Adjustment (Board) concluded that the addition would produce a violation. The Law Division reversed that determination. However, the Appellate Division, in an unreported opinion, agreed with the conclusion of the Board that there was indeed a violation and hence reversed the Law Division. We granted certification, 97 *N.J.* 587 (1984), and now affirm.

I

Appellants, John and Nina Gonchar, reside at 426 Briarwood Lane in Northvale. Carl and Adrianne Rowatti reside next door at number 428. The Gonchars wished to build an addition onto their house so that Mrs. Gonchar's widowed mother could

live with them. They made application for this addition and submitted the necessary building plans, which were prepared by an architect, to the Northvale Building Inspector. On the application form itself the Gonchars described the structure as a "mother and daughter new addition." The Northvale Inspector issued a building permit to the Gonchars on October 5, 1981.

The Rowattis first became aware of the appellants' construction plans on October 23, 1981. On that date the Rowattis noticed that an excavating machine had begun digging in close proximity to the boundary line between the two properties. Mr. Rowatti informed Mr. Gonchar of his belief that the digging appeared to be in violation of local sideyard requirements. Notwithstanding this uncertainty as to the location of the property line, the Gonchars proceeded to pour the footings on October 24, 1981. Shortly thereafter the property was staked and it was indeed shown that the owners' reliance on an old survey had resulted in a sideyard violation. The Gonchars applied for a sideyard variance, which was granted by resolution of the Board on November 19, 1981.

Following the Board's grant of the sideyard variance, the Rowattis attended a meeting of the Northvale Mayor and Council to protest that the appellants' addition amounted to a two-family or multi-family dwelling in violation of the municipality's zoning ordinance. In a letter dated November 28, 1981, a zoning official informed the Gonchars that the addition to their house constituted a violation of the Northvale zoning laws, and that all construction work on this facility had to stop immediately. The official later modified his order to allow the owners to resume construction pending a full review by the Board.

The Gonchars formally appealed the order of the zoning official to the entire Board in accordance with *N.J.S.A.* 40:55D–70, which states in part:

The board of adjustment shall have the power to:

a.   Hear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, decision or refusal made by an administrative officer based on or made in the enforcement of the zoning ordinance * * *.

The owners appeared before the Board not to seek a variance for a nonconforming use but simply to receive a determination as to whether the addition would render the building a two-family dwelling.

After hearing the testimony of Mrs. Gonchar and Mr. Rowatti, in addition to the testimony of a real estate broker, a realtor, and the contractor who actually built the facility, the Board determined that the structure was a multi-family dwelling. In reaching this determination, the Board made the following findings:

1.   That the purpose of the proposed addition would be to accommodate the applicant's mother who is a widow aged 74 years, and presently resides in a home in Avalon, New Jersey.

2.   That it is the intent of the applicant that the proposed premises would be occupied only by a member of their family, namely, the applicant's widowed mother.

3.   That the applicant was granted a variance by the Board of Adjustment on November 19, 1981 for a side-yard variance * * *.

4.   That a stop-work order was issued by the Zoning Officer of the Borough of Northvale on November 27, 1981 and that the applicant continued work at their own risk as stipulated by Counsel.

5.   The proposed addition * * * contains a separate bedroom, separate living room, separate kitchen with its own entranceway from the front of the building entering into a foyer, and also containing a full bathroom. The proposed kitchen in the addition is larger than the kitchen in the present existing structure. It shall contain its own closets and enclosed washer, and heating system with its own boiler.

6.   There is also a second entrance from the porchway of the proposed structure, and a passageway between the main building and the addition.

7.   The present garage will exist between the present structure and the proposed addition.

8.   The utility lines will be the same as the main structure as well as the sewer lines. Presently, there are four occupants of the present structure: mother and father, and two children.

9.   Part of the present structure will be altered.

10.   That there will be no separate electric service, the existing meters will remain, but be relocated; the same gas service, and no separate water line.

11.   There shall be a new furnace and hot water heater due to the fact that the existing system would be inadequate to accommodate this new addition.

12. The subject premises are located within a Residential 12.5 Zone District, providing for occupancy by not more than one family dwellings.

13. That the Zoning Officer, upon inspection of the premises, issued a letter directing the applicants to stop work immediately on November 27, 1981 based upon his interpretation that the plans indicated a multiple family dwelling, which is expressly prohibited in this Residential District.

14. That a number of neighbors in the surrounding dwellings objected to the structure as a multi-dwelling [sic].

The Board, by a vote of six to one, adopted a resolution memorializing its decision on December 17, 1981.

Thereafter, both the neighbors and owners appealed to the Law Division. The Rowattis sought review of the Board's approval of the sideyard variance, while the Gonchars appealed the Board's determination as to the status of the structure itself. On January 19, 1982, prior to the case being heard, the Law Division entered an order permitting the Gonchars to complete construction at their own risk. The court then affirmed the Board's approval of the sideyard variance; however, it disagreed with the Board that the structure amounted to a multi-family dwelling. The Appellate Division affirmed the Law Division with regard to the sideyard issue, which is not before us, the Rowattis not having sought review on that question; but it reversed on the issue of whether the addition converted the owners' home into a two-family or multi-family residence.

II

The ordinance in question provides that

[t]he following uses are expressly prohibited in all zones in the Borough of Northvale:

\*      \*      \*      \*      \*      \*      \*      \*

(2) Apartment houses, garden apartments, boarding-houses or any type of multi-family usage, two-family homes, duplex or double houses [*Northvale, N.J., Code* § 74–11 (1981).]

The municipal Code defines a one-family dwelling as "a separate building designed for or occupied exclusively by one (1) family." The ordinance defines a multiple dwelling as "a

building designed [for] or occupied by more than one (1) family." *Id.* Finally, a "family" is defined in the Code as

[o]ne (1) or more persons related by blood, adoption or marriage, including foster children, living and cooking together as a single housekeeping unit, exclusive of household servants, or a number of persons, but not exceeding three (3), living and cooking together as a single housekeeping unit, where one (1) or more of such persons are not related by blood, adoption or marriage to others * * *. [*Id.*]

Nowhere does the ordinance recognize or define a "mother and daughter new addition," the language the Gonchars used on their building application to describe the structure [1].

Our concern today centers on the definition of a two-family or multi-family dwelling, which is at the heart of this appeal. The addition to the Gonchars' home contains a foyer, bathroom, bedroom, living room, kitchen, and utility room. It also has its own closets, boiler, and heating system. The addition measures 660 square feet, has its own separate entranceway, and its kitchen is in fact larger than the kitchen in the original structure. In viewing that totality of facts and the design of the addition itself, the Board of Adjustment determined that the structure "point[ed] clearly to the establishment of a fully separate and complete apartment * * * [so] as to constitute a separate dwelling."

In affirming the Board's determination, we first acknowledge the standard of review that is applicable to a case of this type. It is well established that an appellate court will uphold the factual determinations of an administrative agency "[i]f there is sufficient credible evidence to support those conclusions * * *." *Goodman v. London Metals Exch., Inc.*, 86 *N.J.* 19, 28 (1981);

---

[1]We are informed that after the events giving rise to this litigation, the Borough enacted an amendment to its zoning ordinance to provide for the expansion or alteration of a dwelling unit to accommodate, as a conditional use, a "mother-daughter dwelling unit." Appellants do not contend that the addition at issue here satisfies the requirements of the amended ordinance; hence, we need not be concerned with any application of the time-of-decision rule. See, *e.g., Kruvant v. Mayor & Council of Cedar Grove,* 82 *N.J.* 435, 440 (1980).

*accord Close v. Kordulak Bros.*, 44 *N.J.* 589 (1965). Particularly in cases in which a board of adjustment's denial of a zoning variance is at issue, the action of the board of adjustment is presumptively correct and its denial will not be overturned unless it is unreasonable, arbitrary, or capricious. *E.g., Rexon v. Board of Adjustment of Haddonfield*, 10 *N.J.* 1, 7 (1952). Although the denial of a variance is not at issue here, the Board's factual conclusions are entitled to great weight and, like those of an administrative body, ought not be disturbed unless there is insufficient evidence to support them. *Cf. Commons v. Westwood Zoning Bd. of Adjustment*, 81 *N.J.* 597, 610 (1980) ("We have frequently advised boards of adjustment to make findings predicated upon factual support in the record and directed to the issues involved.").

There is ample evidence in the record to support the Board's conclusion that the Gonchars' addition converted their residence from a one-family to a multi-family dwelling. The Board heard the testimony of an area realtor who testified that from a purely physical standpoint, the addition made the home a two-family dwelling. The realtor also stated that if enough of the same kind of residences were constructed on or near Briarwood Lane, that circumstance would alter the zoning scheme for that entire part of Northvale.

Our research uncovers only sparse authority dealing with the definition of a two-family or multi-family dwelling. In *Williams v. Adami*, 70 *Misc.*2d 702, 334 *N.Y.S.*2d 539 (1972), the court affirmed the determination of a local zoning board that the addition of a second kitchen and half bath in a one-family residence would convert that structure into a two-family dwelling. The court stated that it agreed with the Board's conclusion "as a matter of logic," and that in any event, "the interpretation by the Board was not arbitrary and unreasonable, its findings were supported by the record, and hence, should not be set aside." *Id.* at 707, 334 *N.Y.S.*2d at 544 (citation omitted).

A somewhat different result was reached in *Stafford v. Incorporated Village of Sands Point*, 200 *Misc.* 57, 102 *N.Y.S.* 2d 910 (1951). There, the court determined that the structure at issue was a one-family residence, notwithstanding the existence of two kitchens and the presence on the premises of the owner's mother and sister. However, the applicable statute, Section 4(6) of the Multiple Dwellings Law, provided that "a building designed for *and* occupied exclusively by two families is a 'two-family' dwelling," and a "single-family private dwelling" is a building "designed for *and* occupied exclusively by one family." *Id.* at 59, 102 *N.Y.S.*2d at 913 (emphasis added). The court concluded that under the accepted definition of the Dwellings Law

neither the design of the house nor the nature of its occupancy standing alone controls. The combination of the design of the house *and* the nature of the occupancy is the two-fold test.

\*     \*     \*     \*     \*     \*     \*     \*

It would seem that as far as occupancy goes, to classify premises as a two-family house there would have to be two separate families not living together as a unit. The using of a dwelling for living purposes by a son [the owner], his family \* \* \* and his mother and sister, in the absence of evidence to the contrary, may not be said to be the setting up of two separate family units who are living not under a single head or management for the purpose of denying a certificate of occupancy in a one family district. [*Id.* at 59, 102 *N.Y.S.*2d at 913 (emphasis in original).]

Thus, because only family members would be living in the building, the court did not find that the design of the residence converted it into a two-family dwelling.

In contrast, section 74–5 of the Northvale ordinance, as noted earlier, defines a multiple dwelling as "[a] building designed [for] *or* occupied by more than one (1) family" (emphasis added). Clearly, the use of the word "or" creates a different test from that applied in *Stafford*. The Board found that the Gonchars' addition constituted "a fully separate and complete apartment for the occupancy of one person," which is simply another way of stating that it is designed for more than one family. Hence, it is the design of the dwelling itself that is violative of the Northvale code, irrespective of who may be living there at this or any future time.

The ordinance's definition of "family" also supports the Board's determination that the structure at issue is a two-family or multifamily dwelling.[2] As noted earlier, *supra* at 51–51, the Code defines "family" in terms not only of relationship but of group activity, as one or more persons "living and cooking together as a single housekeeping unit." In *Missionaries of Our Lady of La Salette v. Village of Whitefish Bay*, 267 *Wis.* 609, 66 *N.W.*2d 627 (1954), a group of three priests and two lay brothers resided together in a large house that was situated in a single-family zone. The trial court found that each person living in the house had his own separate bedroom and that all of the residents ate their meals "at the same table served by one kitchen." *Id.* at 611, 66 *N.W.*2d at 629. On these facts, the Supreme Court of Wisconsin determined that the residents were "liv[ing], sleep[ing], cook[ing] and eat[ing] on the premises as a single housekeeping unit." *Id.* at 616, 66 *N.W.*2d at 631.

The situation revealed by the record in this case, however, is markedly different. Mrs. Gonchar testified on direct examination before the Board that one of the prime purposes behind the construction of the addition was to provide "free access * * * between the rooms that we [the owners] occupy and what my mother will occupy." Mrs. Gonchar also explained:

---

[2] We note only in passing, since it does not relate to the issues on this appeal, that one aspect of the definition of a family in the Northvale ordinance is constitutionally infirm. In *State v. Baker*, 81 *N.J.* 99, 113 (1979), this Court stated that "zoning regulations [that] attempt to limit residency based upon the number of unrelated individuals present in a single non-profit housekeeping unit cannot pass constitutional muster." Hence, inasmuch as it seeks to limit a household unit to no more than three persons "where one (1) or more of such persons are not related by blood, adoption or marriage," the Northvale code is invalid under our decision in *Baker*. For a more detailed discussion of the problems of defining "family" for zoning purposes, see *Baker*, 81 *N.J.* at 107–13; *Annot.*, 12 *A.L.R.* 4th 238 (1982); Comment, "Single-Family Zonings: Ramifications of State Court Rejection of *Belle Terre* on Use and Density Control," 32 *Hastings L.J.* 1687 (1982); "Developments in the Law—Zoning," 91 *Harv.L.Rev.* 1427, 1568–74 (1978).

> She [the mother] can come over, stay for hours, stay for minutes. She'll know what we are doing, who's going where, participate in our discussion. We can go over there, again for minutes or for hours, whatever. She doesn't have to feel afraid if she gets sick. I can stop over for a few minutes, we can eat together. We can eat separately, whatever.

We conclude that what Mrs. Gonchar herself envisioned, and what has indeed resulted from the construction of this addition, is something beyond a single housekeeping unit.

To summarize, several factors lead us to the conclusion that the addition converted the owners' residence into a two-family or multifamily dwelling and allows both the owners and the occupant of the addition itself to live as more than a single housekeeping unit. First, with its separate kitchen, boiler, bathroom, heating system, and entranceway, the addition can function independently from the original residence. Second, there is the closely-related factor that because of its design and physical appearance, the addition may impair the intent and purpose of the zoning plan for the entire area around Briarwood Lane. Third, the owners themselves contemplate an arrangement that would provide Mrs. Gonchar's mother with the opportunity to live and cook separately from the rest of the family whenever she so desires. Finally, as a matter of judicial review, local boards of adjustment must be accorded great latitude in determining facts that may adversely affect a municipality's entire zoning scheme.

We are sensitive to the fact that at the heart of this case there lies a daughter's concern for an elderly parent. Indeed, this Court has recognized that the older members of our society must deal with a number of special problems, particularly in the area of housing. See *Taxpayers Ass'n of Weymouth Township v. Weymouth Township*, 80 *N.J.* 6, 24–30 (1976), *cert. denied*, 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977). We would like to think that our concern for the profound social problems associated with increasing life-expectancies and calculating housing costs is at least as great as that of our dissenting colleague. But we do not view this case as presenting the vehicle by which to address those concerns. At oral argument

before us, on at least two occasions in response to questions from different members of the Court, counsel specifically and unmistakably eschewed any constitutional attack on the ordinance. No constitutional challenge was made in any of the proceedings below. Moreover, we are not presented with an ordinance that seeks to regulate or restrict the use of land on the basis of the user's age.[3] The Northvale ordinance seeks merely to prohibit a certain type of structure, irrespective of the owners' or occupants' ages, or any other classification. Nor are principles of estoppel applicable here. The Gonchars were on notice at several different phases of the construction that they were proceeding at their own risk. Unfortunately, the risk materialized into an actual violation of the Northvale code that the Board of Adjustment correctly recognized.

When, as in this case, the Court is confronted with an ordinance that contains provisions that are, as the dissenter observes, arguably inconsistent, *post* at 61, our obligation is to reconcile those provisions, to read them so as to make sense of them, and then to apply the ordinance in accordance with the intent of the municipality. It is clear to us that the intent of the Northvale ordinance is that when a residential structure is capable of housing two completely independent family units in the kind of lifestyle that, as a matter of fact, characterizes such independent living as defined in the ordinance, the entity is then a multiple dwelling; as such, it is prohibited.

Affirmed.

STEIN, J., dissenting.

As framed by the majority opinion, the sole issue in this case is whether this Court should sustain the determination by the Board of Adjustment of the Borough of Northvale (Board) that

---

[3]To be sure, age-restrictive zoning ordinances do exist and present a different line of analysis from that which is warranted here. For background on these age-related issues, see J.G. Richards, "Zoning for Direct Social Control," 1982 *Duke L.J.* 761, 799–828.

the 660 square foot addition to appellants' dwelling, constructed to accommodate the elderly mother of appellant, Nina Gonchar, transformed what was previously a one-family dwelling into a "multiple dwelling," a use prohibited in all zoning districts by the Northvale zoning ordinance. The majority concludes that the Board's decision has adequate support in the record before it. As a result, the continued occupancy of the remodeled [1] dwelling by the Gonchar family will violate the ordinance and subject the Gonchars to enforcement proceedings unless they alter the structure to conform to the amendments [2] to the Northvale zoning ordinance adopted after this addition was constructed.

Because I believe that this case raises issues more significant than whether the Board's conclusions are supported by the record before it, I cannot join in the majority's disposition.

I

As with many local zoning disputes, this case had simple origins. The Gonchar family, consisting of John and Nina

---

[1] While this litigation was pending, the Law Division entered an order enabling the Gonchars to complete construction of the proposed addition at their own risk.

[2] In 1982, the Borough of Northvale amended its zoning ordinance to establish as a conditional use a mother-daughter dwelling unit, which is defined as a single-family dwelling unit that has been

expanded or altered to accommodate one (1) or more persons related to the principal occupants by blood, adoption, or marriage including foster children, that provides some, but not all, of the living, dining, cooking and sanitation facilities usually associated with an independent and separate dwelling unit and which has a common front entrance to the dwelling. [*Northvale, N.J., Code* § 74–5 (1982).]

In order to approve a mother-daughter addition, the planning board must determine that the following standards, among others, have been met:

that the expansion or alteration of the single-family dwelling unit shall not exceed 25% of the floor area of the entire dwelling;

that the expansion or alteration does not divide nor give the appearance of dividing the dwelling into two (2) separate dwelling units capable of independent occupancy. [*Id.* at § 74–7.]

Gonchar and their two children, desired to construct an addition to their home to accommodate Mrs. Gonchar's recently widowed 74-year-old mother. Mrs. Gonchar eloquently explained her family's intentions in testimony before the Board:

Well, we're building the addition for my mother. She's living alone. She's a widow. My father died about three years ago. She's seventy-four years old.

Now, one of the things that our family believes in and has believed in for a long time is trying to keep the family together. That means taking care of old parents. This is not something we just decided last week, but it's almost a tradition, because when my parents came to this country, the United States from Europe, my grandmother came with them.

Now, at that time they had many difficulties, and if my parents had agreed at that time to leave my grandmother behind they could have come over much sooner, but they felt that she was family and they all had to stay together. Now, right now my mother can't stay alone. She can't take care of the house. She can't do the maintenance. My husband has been going down Saturdays, helping her clean gutters, cut grass, whatever has to be done, repairs, and we're constantly reading articles about old people, what a hard time they're having, about old-age homes, how they're depressed.

On the other hand, there are many longevity studies that will show that what old people are most afraid of is loneliness or being a burden to someone. On the other hand, what makes them live longer is if they can be made to feel useful, that they're not alone, in a sense independent, and those are the two things that we had in mind when we were planning this addition.

Now, we have acted openly and honestly from the very beginning. We haven't hidden anything. When we drew up the plans, one of the main things in the construction is the free access that we have between the rooms that we occupy and what my mother will occupy. This means that we can go back and forth without ever stepping outside. That was very important. She can come over, stay for hours, stay for minutes. She'll know what we are doing, who's going where, participate in our discussion. We can go over there, again for minutes or for hours, whatever. She doesn't have to feel afraid if she gets sick. I can stop over for a few minutes, we can eat together. We can eat separately, whatever.

On the other hand, both of us will have a certain amount of privacy. Now, my mother, she has been a housewife for fifty years and I can't all of a sudden put her in an old-age home or stick her into one room. She has many friends. She has many activities. She goes to church. She participates in various organizations. She goes to the cemetery in Spring Valley where my father is buried, and I would like her to feel that she can continue doing the things that she's been doing for so many years. I want her to feel that this is just a change and not the end, not a drastic thing in her life, and I can't believe that I'm the only one who feels that this would be an ideal solution for an old person. That's why we're building it.

In order to afford "independence" to Mrs. Gonchar's mother, the addition contains a living room, bedroom, kitchen, and bath. It has a separate front entrance and a hallway that connects the addition to the remainder of the house. When asked at the Board hearing how the completed structure differed from a two-family house, the Gonchar's builder testified: "I think the unit that's being added on is smaller. You couldn't offer that to a family. The bedroom is miniscule. The living room is good size but everybody likes a good sized living room; but otherwise, you can't rent the place. It's about that big (indicating)."

Initially, the Gonchars' request for a building permit was processed routinely as an application for a "mother and daughter new addition" and the permit was issued on October 5, 1981. The Northvale building inspector testified at the Board hearing that in his opinion the remodeled dwelling would continue to be a one-family unit and noted that "[i]f I thought it was a two-family I wouldn't have issued a building permit."

The validity of the building permit was not challenged until November, 1981, when the Rowattis, neighbors of the Gonchars, attended a meeting of the Northvale governing body, and protested that the renovation would create a two-family dwelling. The building permit was revoked and the Gonchars appealed the revocation to the Board pursuant to *N.J.S.A.* 40:55D–70(a).[3]

After the Board determined that the proposed addition would transform the Gonchars' residence into a two-family house, separate actions were instituted against the municipality by the Rowattis and the Gonchars. The Rowatti suit, in which the

---

[3]Although appellants did not seek a use variance from the provisions of the original ordinance, they may now apply for relief by way of a use variance to permit a deviation from the specifications or standards regulating a mother-daughter dwelling unit, a conditional use pursuant to the amended Northvale zoning ordinance. *L.*1984, *c.* 20; *N.J.S.A.* 40:55D–70(d)(3); *see Darrell v. Governing Body of Township of Clark,* 82 *N.J.* 426 (1980).

Gonchars were also defendants, challenged the validity of the sideyard variance granted by the Board. *Ante* at 48. The Gonchar suit challenged the Board's determination that the proposed alteration would result in a multiple dwelling prohibited by the zoning ordinance. Neither the pleadings nor the pretrial order in the Gonchar suit challenged the validity of the Northvale ordinance.

The actions were consolidated for trial. The Law Division affirmed the Board's grant of the sideyard variance but reversed the Board's interpretation of the zoning ordinance. The trial court concluded that the Northvale ordinance did not prohibit the use of a dwelling by a single family even if the dwelling, because of its design, was theoretically susceptible to use by more than one family.

The municipal defendants did not appeal from the Law Division decision. The Rowattis, however, appealed and the Appellate Division reversed, concluding that deference to the Board's determination was required unless the Board's decision was arbitrary, capricious, and unreasonable.

We granted certification, 97 *N.J.* 587 (1984). The first contention asserted in the petition challenged the validity of the local ordinance in these terms:

A determination of the permissible limits municipal zoning regulations may place upon family living arrangements, particularly as affecting elderly family members, is a question of such general public importance as to warrant its consideration by the Court.

## II

Clearly, the uncertainty over the legality of the Gonchars' proposed addition had its roots in the provisions of the local zoning ordinance, which purported to distinguish single family from multiple family dwellings. Among the pertinent provisions then in effect were the following definitions:

DWELLING, ONE-FAMILY—A separate building designed for or occupied exclusively by one (1) family.

DWELLING, MULTIPLE—A building designed [for] or occupied by more than one (1) family.

\* \* \* \* \* \* \* \*

FAMILY—One (1) or more persons related by blood, adoption or marriage, including foster children, living and cooking together as a single housekeeping unit, exclusive of household servants, or a number of persons, but not exceeding three (3), living and cooking together as a single housekeeping unit, where one (1) or more of such persons are not related by blood, adoption or marriage to others shall also be deemed to constitute a "family."

\* \* \* \* \* \* \* \*

MINIMUM LIVING FLOOR AREA—The habitable area of a home or apartment customarily used for living such as a kitchen, dining room, living room, bedroom, bathroom, family room, game room, hall, foyer, entry and closet and excluding basements, attics, garages and storage areas. [*Northvale, N.J., Code* § 74–5 (1981).]

The Gonchars' residence was located in the R 12.5 Residential Zone, in which the only permitted principal uses were "single- family, detached dwellings" and "churches." The ordinance also prescribed a minimum living floor area of 1200 square feet for a dwelling in the R 12.5 zone.

Other than the requirement as to minimum living floor area, the ordinance contained no standards to distinguish buildings "designed \* \* \* for one family" from buildings "designed \* \* \* for more than one family." Moreover, the definitions of a one-family dwelling and a multiple dwelling are facially inconsistent since, reading the ordinance literally, a dwelling occupied by one family, but designed for more than one family, would be encompassed by *both* definitions.

At the hearing, the only reference to the minimum floor area requirement in the R 12.5 zone was a comment by the Board Chairman:

Now, it has been brought out that that could be a separate house if the other house wasn't there. I sat at council meetings and I disagree with that because in that particular zone you need 1200 square feet to constitute a separate house, and that is only 600 and some odd square feet \* \* \*."

The Mayor of Northvale appeared at the hearing and acknowledged that the issue before the Board was more difficult because of the lack of specificity in the Borough's ordinances:

The other thing is I'm not going to make a statement either way. I just want to say that I disagree with Mr. Scrivanek that our ordinances are not all that they should be. Our ordinances do not define a two-family house, which was at the suggestion of the individual who wrote our master plan and the borough attorney. This has been a problem in not defining a two-family house. The building inspector stated earlier that his position was that they were family and they were related and living together. Perhaps if the definitions had been better, Mr. Scalabrin would have been a little bit more correct, or whatever we may determine here, but as I see it right now, the real determination is as to whether it's going to be the structure that determines whether it's a two-family or the use.

CHAIRMAN O'NEILL: How about dimensions?

MAYOR ROONEY: Bulk you've already decided, but I'm talking about the structure or the use, whether you have a two-family and if you put a mother/daughter in it and say it's a family, only one family, that's one thing. If you take that out, it's a two family. I think that's up to the Board and I am here listening tonight because I want to hear the Board's decision because the Mayor and Council's going to have to enforce this and provide the proper ordinances so the building inspector will carry them out in the future.

### III

In its disposition, the majority ignores the challenge to the validity of the underlying ordinance, which was asserted for the first time in the petition for certification. Rather, it focuses on the more basic question of the sufficiency of the record to support the Board's findings, an issue that would not normally provoke the exercise of this Court's discretionary power of appellate review. *R.* 2:12–4.

In my view, the more appropriate disposition of this case would be to remand it to the Law Division to determine the validity of the Northvale zoning ordinance in effect in 1981. Although not raised in the pleadings or at trial, appellants contended in their petition for certification that the Northvale ordinance contained no standards "to distinguish single-family from multi-family structures in these situations," a contention that finds support in the testimony of local officials before the Board and in the action taken by the municipality in 1982 to amend the ordinance in order to prescribe specific standards for distinguishing between one- and two-family dwellings in certain circumstances. *See supra* at 57 n. 2.

On this record, it would be inappropriate to resolve the contention that the original Northvale ordinance, as applied, is impermissibly vague and violates appellants' due process rights. That determination should be made on the basis of an appropriate record, *Bogert v. Washington Township*, 25 *N.J.* 57, 62 (1957), with an opportunity afforded to appellants, the Rowattis, and the municipality to introduce such factual and expert testimony as may be pertinent to this issue. *See Rivera v. Gerner*, 89 *N.J.* 526, 537–39 (1982); *Beck v. Beck*, 86 *N.J.* 480, 497 (1981).

What *is* evident from this record is that an addition that was concededly designed for occupancy by the expanded Gonchar family—and no one else—was determined by the Board to have been designed, at least potentially, for more than one family. To this day, no one knows what specific feature of the addition was the proverbial straw that broke the camel's back. An addition constructed to accommodate any family's elderly parent or married child would typically include a bedroom, bathroom, and living area. Separate kitchen facilities obviously afford a measure of added independence, particularly for a parent accustomed to maintaining her own home in her own way. Perhaps the addition without a separate entrance would have passed muster, although the testimony indicated that this entrance was constructed at ground level in order that Mrs. Gonchar's mother could avoid the use of a stairway. The conflict inherent in this case is that the very same design features that accommodated Mrs. Gonchar's mother's desire for both independence and the security of living with relatives were relied upon by the Board for its conclusion that the dwelling was theoretically adaptable to multi-family use.

The dilemma that confronted the Gonchar family in this case is one that confronts many families as life-expectancies increase and housing costs escalate. How does a family accommodate a relative in its home while preserving a reasonable degree of independent living for both the basic family and the invited relative?

A common response will be the construction of an addition to the existing dwelling in order to accommodate the expansion of the family. To the extent that zoning ordinances determine whether or not such additions may be constructed, such ordinances must provide clear standards to guide both applicants and local officials in ascertaining the extent to which a single-family dwelling may be altered to provide independent facilities for a family member without converting it into a multiple dwelling. *See Town of Kearny v. Modern Transp. Co.*, 116 *N.J.Super.* 526, 529 (App.Div.1971) (zoning ordinances "should be clearly and expressly imposed and should not be left to inference," especially where a citizen seeks in good faith to utilize his property) (quoting *Maplewood v. Tannenhaus*, 64 *N.J.Super.* 80, 89 (App.Div.1960), certif. denied, 34 *N.J.* 325 (1961)); *accord State v. Lashinsky*, 81 *N.J.* 1, 18 (1979) (an ordinance's language must enable a person of "common intelligence, in light of ordinary experience" to be apprised that his conduct is unlawful).

Since the original Northvale ordinance did not provide any standards, the Gonchars, their architect, the building inspector—and particularly the local board of adjustment—were required to rely solely on subjective criteria to determine whether the proposed addition was permissible. That the Board reached a different conclusion from the Gonchars' and the building inspector's as to the ordinance's meaning hardly justifies the harsh outcome of this litigation, especially since the root of the entire controversy can be traced directly to the lack of specificity in the Northvale ordinance.

Our antipathy to statutes or ordinances that are impermissibly vague was explained in *Grayned v. City of Rockford*, 408 *U.S.* 104, 92 *S.Ct.* 2294, 33 *L.Ed.*2d 222 (1972):

Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who

apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. [*Id.* at 108–09, 92 *S.Ct.* at 2298–99, 33 *L.Ed.*2d at 227–28 (footnotes omitted).]

In *State v. Cameron*, 100 *N.J.* 586 (1985), this Court recently struck down a municipal ordinance regulating "churches and similar places of worship," because we found the language impermissibly vague as applied to appellant:

We conclude that, under these circumstances, the ordinance does not give fair warning or notice to enable a person of average intelligence and experience to know what activities could turn his or her home into a church. Further, the ordinance does not foreclose unguided discretion in its application; it provides no sufficient assurance that its broad and undefined terms could be fairly, consistently, and uniformly enforced. [*Id.* at 602.]

It is uncontroverted that in this case the provisions of the Northvale ordinance misled not only the applicants and their architect but also the local building inspector. The ordinance's definitions of single-family and multiple-family dwellings were facially inconsistent. Moreover, they appear to be devoid of standards that would distinguish one from the other. In this context, the Board's conclusion that the altered residence is a multiple-family dwelling is entirely subjective, lacking the benefit of standards that would guide the Board's exercise of its administrative discretion.

Although the issue of the ordinance's validity was not raised below, it was advanced in the petition for certification, and was raised on several occasions during oral argument.[4] Ordinarily, this Court declines to consider issues not raised at trial unless they are jurisdictional or concern matters of great public interest. *Nieder v. Royal Indemnity Ins. Co.*, 62 *N.J.* 229, 234 (1973). As this record clearly indicates, the validity of the Northvale ordinance is an issue of significant public importance. To facilitate its resolution, we should remand the matter to the Law Division and stay the enforcement of the Northvale

---

[4]Although in response to direct questions counsel eschewed any challenge to the constitutionality of the ordinance, counsel repeatedly contended that the ordinance was defective because it lacked adequate standards.

ordinance until that issue has been determined. Therefore, consideration of the validity of the Board's conclusions is premature until the ordinance has been construed and its constitutionality determined on a proper record.

Although based on my view of the case I would not reach the validity of the Board's determination, one aspect of the majority opinion requires comment. In support of the Board's conclusions, the majority cites a highly suspect portion of the Northvale ordinance's definition of "family" as "one or more persons living and cooking together as a single housekeeping unit." Pointing to the separate kitchen provided in the addition for Mrs. Gonchar's mother, the majority observes that "the owners themselves contemplate an arrangement that would provide Mrs. Gonchar's mother with the opportunity to live and cook separately from the rest of the family whenever she so desires." *Ante* at 55.

The Northvale Board, however, did not conclude that the Gonchar household was not a "family" because of the existence of separate cooking facilities in the addition. Moreover, although the constitutionality of the Northvale definition of "family" is not before us, it is difficult to conceive of a police-power interest that would sustain a requirement that persons related by blood must use the same kitchen facilities to qualify as a "family" under a local zoning ordinance. The majority's reliance on the separate kitchen provided in the addition as a source of additional justification for the Board's conclusion in this case ignores the admonition of the United States Supreme Court in *Moore v. East Cleveland,* 431 *U.S.* 494, 97 *S.Ct.* 1932, 52 *L.Ed.*2d 531 (1977):

> When a city undertakes such intrusive regulation of the family, neither Belle Terre nor Euclid governs; the usual judicial deference to the legislature is inappropriate. "This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." A host of cases * * * have consistently acknowledged a "private realm of family life which the state cannot enter." Of course, the family is not beyond regulation. But when the government intrudes on choices concerning family living arrangements, this

Court must examine carefully the importance of governmental interests advanced and the extent to which they are served by the challenged regulation. [*Id.* at 499, 97 *S.Ct.* at 1935, 52 *L.Ed.*2d at 537 (citations omitted).]

In *Baskin v. Zoning Bd. of Appeals of Ramapo*, 48 *A.D.*2d 667, 367 *N.Y.S.*2d 829, (App.Div.1975), rev'd, 40 *N.Y.*2d 942, 390 *N.Y.S.*2d 412, 358 *N.E.*2d 1037 (1976), the New York Court of Appeals, in reversing the judgment below, adopted the dissenting opinion in the Appellate Division, which commented as follows:

The occupants of the residential housing which is the subject of the instant appeal are clearly all members of one family. The fact that they will have separate kitchens arising out of the need for the daughter-in-law to have a kosher kitchen cannot serve to transform what is one family living in one house in shared heating, utility and entrance facilities, and without segregation within the house (witness the open stairway between floors), into a two-family home simply because it could be altered into a two-family home. Zoning ordinances, which are enacted under the police power to protect the public health, welfare and morals, should not be used to bar the owners and legal occupants of a one-family home in a one-family zone from using available space to provide themselves with such luxuries as an additional sitting room, kitchen, bathroom or extra bedroom simply because, in other hands, such facilities could be used for maintenance of a two-family home. It is clear that the existence of a mere opportunity for future evasion or violation of law does not raise a presumption that such violation in fact actually presently exists (*Holt v. United States*, 218 U.S. 245, 251, 31 S.Ct. 2 [5], 54 L.Ed. 1021). There will be time enough for the petitioner respondent neighbor to take action to end a violation of the zoning ordinance when and *if* it occurs. [*Id.* at 668, 367 *N.Y.S.*2d at 832 (emphasis in original).]

As stated, I believe that the Court's disposition of this matter inadequately deals with the important underlying legal issues relating to municipal regulation of residential renovations to accommodate family members. In my view, the correct disposition of this case would be to remand it to the Law Division to determine on a proper record the validity of the original Northvale ordinance. I respectfully dissent.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For remandment*—Justice STEIN—1.